No. 110,452

In the Matter of KEVIN E. DELLETT, *Respondent.*

(324 P.3d 1033)

Opinion filed March 28, 2014.

*Kimberly L. Knoll*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*N. Trey Pettlon, III*, of Law Office of Pettlon & Ginie, of Olathe, argued the cause, and *Kevin E. Dellett*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Kevin E. Dellett, of Overland Park, an attorney admitted to the practice of law in Kansas in 1995.

On September 20, 2012, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer and also eventually filed a plan of probation. On February 11, 2013, the deputy disciplinary administrator and respondent agreed to a lengthy, written stipulation which the hearing panel accepted at the April 10, 2013, hearing on the formal complaint.

Based upon this stipulation, the hearing panel determined respondent violated KRPC 1.1 (2013 Kan. Ct. R. Annot. 446) (competence); 1.3 (2013 Kan. Ct. R. Annot. 464) (diligence); 1.4(a) (2013 Kan. Ct. R. Annot. 484) (communication); 1.5(a) (2013 Kan. Ct. R. Annot. 503) (fees); 1.16(d) (2013 Kan. Ct. R. Annot. 569) (termination of representation); and 8.4(d) (2013 Kan. Ct. R. Annot. 655) (engaging in conduct prejudicial to administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

*"Findings of Fact and Conclusions of Law*

. . . .

"11.   On February 11, 2013, Ms. Knoll, the respondent, and his counsel entered into a written stipulation. The parties presented the stipulation to the hearing panel. The hearing panel accepts the stipulation of the parties. The stipulation provides, as follows:

'COMES NOW Kimberly L. Knoll, Deputy Disciplinary Administrator, pursuant to the Supreme Court Rules Relating to Discipline of Attorneys and Respondent, Kevin Dellett, by and through counsel, Trey Pettlon and agree to the following stipulation of facts:

'1.   Kevin E. Dellett is an attorney at law, Kansas Attorney Registration No.16764. His last registration address with the Clerk of the Appellate Courts of Kansas is [], Overland Park, Kansas 66213. The Respondent was admitted to the practice of law in Kansas on April 28, 1995.

'2.   On April 22, 2008, the Office of the Disciplinary Administrator received a complaint from [C.H.N.] regarding Respondent. Case number DA 10,498.

'3.   Respondent filed a response to the Complaint on May 19, 2008.

'4.   In the response, Respondent admitted that he failed to respond to several requests for updates.

'5.   In the response, Respondent admitted he did not move the case along as quickly as the client would have liked.

'6.   The Respondent agreed to participate in the Attorney Diversion Program. Respondent entered the Program on September 29, 2010.

'7.   As part of the agreement, the Respondent stipulated to the following:

'DA 10,498

  a.  Respondent was retained by DiscountCoffee.com to represent it in an action filed against it in the District Court in Johnson County, Kansas.
  b.  Respondent received a $5,000 retainer on July 24, 2007.
  c.  Respondent filed a general denial and then on August 23, 2007, he filed an Answer and Counterclaim.
  d.  The client requested updates on the status of the case on September 28, 2007, October 3, 2007, October 4, 2007, October 8, 2007, and October 15, 2007.
  e.  Respondent emails client on October 18, 2007, and informs client that Respondent would be seeking an extension of time to file answers.
  f.  Client requests an update on November 26, 2007, December 26, 2007, January 10, 2008, and another time in January 2008.
  g.  Respondent admits to client he has not been communicating with the client via email sent February 12, 2008.

h. Client terminates Respondent on February 13, 2008.

'8.    On November 20, 2008, the Office of the Disciplinary Administrator received a complaint from [M.V.] regarding Respondent. Case number DA 10,669.

'9.    Respondent filed a response to the Complaint on February 5, 2009.

'10.   In the response, Respondent noted he communicated often with complainant.

'11.   Respondent met with the incarcerated client [, J.P.,] twice.

'12.   In the response, Respondent admitted he did not directly inform his client that the client's jury trial was continued once.

'13.   In the response, Respondent admitted he did not directly inform the client that he had requested another continuance of the trial. He did notify a third party that was involved with the client.

'14.   The court denied the request. Respondent does not recall informing complainant of his plan to request reconsideration of the denial of the continuance.

'15.   Respondent's cell phone records indicate he attempted to reach complainant on July 24 and July 25. The trial was scheduled for August.

'16.   Respondent was terminated on July 25.

'17.   Respondent agreed to participate in the Attorney Diversion Program. Respondent entered the Program on September 29, 2010.

'18.   As part of the agreement, Respondent stipulated to the following:
'DA 10,669

a. Respondent was retained to represent [J.P.] who was charged with aggravated indecent liberties with a child. The retainer was paid by the Complainant, [M.V.], [J.P.]'s wife.

b. Respondent agreed to represent [J.P.] for $15,000 for a preliminary hearing, plea negotiations, plea and sentencing. If a trial was required, the fee would be $5,000 more.

c. The fee agreement provides: ". . . upon signing of this contract such fees are non-refundable."

d. On July 25, 2008, Respondent was terminated from representing [J.P.]. At the time of the discharge, [J.P.] had waived his preliminary hearing. There had been no plea and no work performed as to sentencing. An accounting was requested. Respondent refused to return any of the retainer, citing the "non-refundable" clause in the fee agreement.

e. Respondent did not normally keep time records on criminal defense cases.

'19.   In his response, Respondent admitted he deposited all funds into his operating account.

'20.   On November 18, 2009, the Office of the Disciplinary Administrator received a complaint from [attorney] Mark Rohrbaugh regarding Respondent. Case number DA 10,[956].

'21.   Respondent filed a response to the Complaint on January 12, 2010.

'22.   In his response, Respondent admitted to violating KRPC 1.3 and KRPC 1.4.

'23.   Respondent agreed to participate in the Attorney Diversion Program. Respondent entered into the Diversion Program on September 29, 2010.

'24.   In the Agreement, Respondent stipulated to the following:

'DA 10,956

a.  Respondent was retained by [A.S.] to represent her in a domestic case.

b.  Respondent entered his appearance in 2006. Between December 2006 and the fall of 2008, a Third-Party Petition for Separate Maintenance was filed and a parenting plan was negotiated.

c.  Respondent requested additional time to file an answer to the original proceeding.

d.  Respondent was granted extra time but did not file an answer.

e.  In October 2008, [A.S.]'s husband filed a Third-Party Petition for divorce. Respondent admits receiving the Petition.

f.  In December 2008, a Motion for Default Judgment was filed in the divorce action. Respondent admits receiving the Motion.

g.  Respondent admits he failed to respond to the motion, failed to notify the client of the hearing and failed to appear at the hearing.

h.  Respondent admits being contacted by the court about the missed hearing. Respondent failed to take any action to correct the situation.

i.  Default judgment was entered. Respondent failed to notify his client after receiving the decree of divorce. The client learned from her then ex-husband that they were divorced.

j.  [A.S.] retained new counsel who filed a motion to set aside the divorce.

k.  The court found grounds to reaffirm the divorce but set aside all other rulings.

'25.   The Agreement also provides: The Disciplinary Administrator and the Respondent agree that the Respondent violated KRPC 1.1, 1.3, 1.4, 1.5, 1.16 and 8.4(d)[.]

'26.   As part of the diversion agreement, Respondent agreed to the following:

a.  Prior to June 25, 2011, Respondent was to complete fourteen hours of CLE, including four hours designated as ethics hours. Proof of compliance was to be in the form of a CLE transcript.

b.  Within one week of receiving a document pertaining to a client, the Respondent was to send a copy to the client. Respondent was to make every effort to return phone calls within two business days. Respondent was to make every effort to respond to written correspondence within one week.

c. Respondent was to meet all court deadlines.

d. Respondent was to work with KALAP.

e. The Respondent was required to remove any reference to a non-refundable fee and to follow the Kansas Rules of Professional Conduct as they relate to fees and retainers. The Respondent was to use a fee agreement that clearly stated the payment terms and when Respondent was to commence work on the case. The Respondent was to provide a sample fee agreement to the practice supervisor, John Gerstle.

f. Respondent was to resolve the fee dispute with Complainant [V] through the Johnson County Bar Association Fee Dispute Committee.

g. Respondent was to review all of his cases every 60 days and cross-check with court dockets to make sure he was meeting deadlines. He was to reconcile his calendar on a daily basis.

h. Respondent was to meet with and provide John Gerstle access to his files.

'27.    Respondent did submit the fee dispute to the Johnson County Bar Association.

'28.    Mediation was never conducted, instead, it was agreed that Respondent would return $10,000.00 from the $15,000.00 retainer Respondent had asserted was non-refundable.

'29.    Respondent paid $2,000.00 to [V] on October 6, 2011.

'30.    Respondent made the final $8,000.00 restitution payment on October 27, 2011.

'31.    Respondent is working with KALAP.

'32.    Respondent completed the required CLE hours on June 30, 2011. The Agreement required the hours to be completed by June 25, 2011.

'33.    Respondent and Gerstle did meet frequently.

'DA 11,445

'34.    On October 13, 2011, the Office of the Disciplinary Administrator received a complaint from [M.M.] regarding the Respondent. Case number DA 11,445.

'35.    [M.M.] is deaf. She sought out Respondent's assistance because she believed that the Olathe Club for the Deaf defamed, bullied, slandered and libeled her. The acts against her started in 2008. The Olathe Club for the Deaf is a domestic corporation.

'36.    [M.M.] caused a binder of papers to be delivered to Respondent on December 30, 2009. She had previously personally met with Respondent to discuss the matter.

'37.    Respondent, through counsel, responded to the complaint on December 4, 2011. Respondent acknowledged that he did not respond to every email. Respondent reports he did not respond if he did not have new information.

'38. Respondent admitted he did not file suit or send a demand letter as promptly as the client would have liked. Some of the delay is attributable to the client not promptly providing material; the voluminous amount of material provided that needed to be reviewed to determine and research the legal claims that were possible; and some is attributable to Respondent and client travelling.

'39. Respondent believed client to be a good person who was wronged. Respondent also came to realize that the case was not going to result in any significant monetary recovery, and, in fact, the expenses might exceed any recovery.

'40. Respondent researched several theories. It became clear that [M.M.] was going to have difficulty proving damages.

'41. Respondent filed suit on behalf of [M.M.] against the Olathe Club of the Deaf on October 28, 2011.

'42. In the December 4, 2011, letter, counsel reports that Respondent and [M.M.] had worked out their difficulties and Respondent agreed to continue to represent her pro bono. Although she offered to pay a fee on more than one occasion, he knew she could not afford to pay an hourly fee.

'43. On October 21, 2011, Respondent told Complainant he was still working on her case. He filed suit a few days later, on October 28, 2011.

'44. On January 12, 2012, the Judge wrote a bench note stating: "Serve or Dismiss/to Be Served by 03/23/12."

'45. On January 27, 2012, a Motion for Extension of Time to accomplish service was filed. An Order Granting an Extension of time was entered on January 27, 2012.

'46. Respondent did not provide [M.M.] with a copy of the Motion and Order for Extension of Time to accomplish service.

'47. The investigator met with [M.M.] on March 2, 2012. It was during this meeting [M.M.] learned the case was in danger of being dismissed due to the lack of service. After the meeting with the investigator, [M.M.] emailed the investigator regarding the service issue.

'48. On March 23, 2012, a Request and Service Instruction Form Summons and Petition to the Olathe Club of the Deaf was issued.

'49. Respondent served an individual named Leonard Hall on March 23, 2012. Mr. Hall is the attorney for the Olathe Club of the Deaf; he is not the registered agent. Mr. Hall agreed to accept service.

'50. The Olathe Club of the Deaf filed a "Memorandum" on April 12, 2012, contending that the suit was not timely filed and Respondent did not properly obtain service because he served the Club's lawyer, not the registered agent.

'51. All [M.M.] wanted was an apology from the Club. On August 20, 2012, the Respondent obtained a written letter of apology from the Club.

'52. On August 21, 2012, Respondent presented the Court with a joint motion for dismissal and order.

'53. The court dismissed the action with prejudice.

'DA 11,521

'54. On January 30, 2012, the Office of the Disciplinary Administrator received a complaint from [C.C.L.] regarding the Respondent.

'55. Respondent filed a response February 22, 2012.

'56. Complainant met with Respondent on January 6, 2012.

'57. Complainant retained Respondent on January 10, 2012, to represent him in a criminal case in which Complainant had been charged with domestic violence.

'58. Complainant paid Respondent $4010.00 on January 10, 2012. Respondent reduced his fee from the original quote. The ten dollars was to pay the District Attorney fee for police reports.

'59. The retainer was not deposited in either of Respondent's attorney trust accounts. It was deposited in his operating account pursuant to the Commitment Agreement.

'60. Complainant called Respondent's office on January 11, 2012, and requested a return call.

'61. Respondent e-mailed a "Retainer Agreement" to Complainant on January 12, 2012. Complainant never executed the agreement.

'62. Complainant called Respondent's cell phone on January 12, 2012, and there was no answer.

'63. On January 12, 2012, Respondent contacted the assigned prosecutor to determine the State's position on modification of the No Contact Order, in the event [C.C.L.'s wife] wanted the No Contact Order modified. Respondent was advised that the State was opposed to a modification. Respondent was advised that [C.C.L.]'s wife had submitted paperwork requesting a modification to no violent contact and that the State had forwarded that request on to the judge. Respondent contacted the judge and was told the judge had modified the no contact order to allow phone and electronic communication.

'64. Respondent advised the client and his wife of the modification.

'65. Respondent told Complainant that he would review the police reports on January 17, 2012. He did not review the reports until January 18, 2012, because he did not receive the discovery from the District Attorney's Office until January 18, 2012. His assistant redacted them on January 19, 2012.

'66. On January 18, 2012, Complainant called Respondent's office in the morning and requested a return call. He then called Respondent's cell phone two times in the afternoon. There was no answer.

'67. Respondent reports his phone log indicated complainant tried calling twice on January 19, 2012.

'68. Respondent admits to missing Complainant's calls. Respondent had his assistant call Complainant back on January 19, 2012, to set up a meeting to review the police reports on the next day, January 20, 2012.

'69. On January 20, 2012, Complainant and Respondent met for approximately an hour. Respondent provided the redacted police reports to Complainant. Respondent agreed to contact the prosecution on Monday, January 23, 2012, to discuss further modification of the No Contact Order.

'70. Early on January 23, 2012, Complainant called Respondent and told him he was considering terminating Respondent's representation.

'71. Respondent set up a meeting for that afternoon.

'72. Complainant met with Respondent and voiced concern that Respondent did not have time to properly represent him.

'73. Complainant asked for half of his retainer to be returned and to modify the unsigned retainer agreement so that those funds would be paid at the end of the representation. Respondent spent 1.75 hours with Complainant.

'74. Respondent refused to refund any money and did not agree to any modification of the retainer agreement. Respondent indicated he was eager to continue to represent Complainant. Complainant agreed to continue the representation.

'75. Respondent believed that Complainant left the meeting satisfied that Respondent did have the time to represent him and understood the strategy to be employed. Respondent continued to work on the case.

'76. Respondent reports that he had no contact with Complainant on January 24, 2012, or January 25, 2012.

'77. On January 26, 2012, Respondent called Complainant. Complainant said he was driving and would call Respondent back. Complainant emailed Respondent and terminated his services. Complainant asked for a refund of $3,500 based on his calculation that Respondent had spent 2 hours working on Complainant's case. Complainant demanded that payment be made within 7 days or he would file a disciplinary complaint.

'78. Complainant filed the complaint on January 30, 2012, three days before the deadline he set.

'79. Respondent filed a Motion to Withdraw on February 1, 2012.

'80. Respondent emailed a billing statement for $1,382.50, representing 5.75 hours, to [Complainant] at 8:47 p.m. on February 1, 2012. Respondent proposed to refund $2,700.00.

'81. Complainant suggested Respondent was owed for 3.1 hours and requested a refund of $3,165.00.

'82. Respondent agreed in a subsequent email that his fee should be reduced to $1,132.50 because he inadvertently charged for the original consultation. Respondent intended a half hour of the initial consultation to be free. Accordingly, Respondent offered to refund $2,877.50.

'83. Respondent then offered to reduce his fee to $1,000.00, as a compromise, in order to resolve the fee dispute without having to submit the matter to the Johnson County Fee Dispute Committee. On February 3, 2012, Respondent provided a $3,000.00 refund check to Complainant.

'84. The unexecuted retainer agreement provided, in material part:

"Initial retainer: At or before the signing of this agreement, you agree to pay a flat fee of $4,000.00, representing a "Commitment Fee" intended to commit the Firm to represent you and not as a fee to be earned by future services. You agree that the Commitment Fee is earned in full when tendered and will be deposited in the general operating account and will not be held "in trust" for you. You acknowledge that the Commitment Fee represents a sum that you are paying to ensure the Firm's availability to represent you in this matter. You further acknowledge that the Commitment Fee represents a sum that you agree the Firms' services and efforts are worth irrespective of the actual total amount of time devoted to the representation.

✻ ✻ ✻

Costs of Delay: If resolution of the case is delayed or complicated as a result of your actions, (for example, if you fail to appear as ordered, cancel appointments, or fail to provide information or documents necessary for your representation) you agree to pay additional attorney fees based on my hourly rate of $350.00/hr. At such point, the Firm charges for attorney services in intervals of one-tenth of an hour, or 6-minute intervals rounded up to the nearest one-tenth. For example, a six minute telephone call is billed as .1 hour; a seven minute telephone call is billed as .2 hour.

✻ ✻ ✻

"USE OF OUTSIDE COUNSEL Occasionally, it may be necessary for outside counsel to appear in your case due to unavoidable scheduling conflicts such as hearing in different courts at the same time. You agree to allow the Firm, at its discretion, to retain outside counsel to appear in your case if and when such a scheduling conflict occurs. We agree that the Firm will pay any fee for any services of such outside counsel and that you are not responsible for any fee owed to any such outside counsel.

✻ ✻ ✻

"ATTORNEY CASE-LOAD You understand that the Firm's attorneys have a significant case load, and that yours is not our only case. You understand that the Firm's attorneys must determine in their sole discretion when work is to be performed on your case. Additionally, we strive to return phone calls by the end of the next business day, but many times this may not be possible due to a number of factors, such as hearings, depositions, meetings etc."

The above stated acts by the Respondent, Kevin Dellett violate Kansas Rules of Professional Conduct 1.1, 1.3, 1.4, 1.5, 1.16, and 8.4(d).'

"12. Based upon the parties' stipulation, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.16, and KRPC 8.4(d), as detailed below.

"KRPC 1.1

"13. Lawyers must provide competent representation to their clients. KRPC 1.1 provides the requirement in this regard:

'A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.'

The respondent failed to provide competent representation to A.S. The respondent failed to inform his client that a motion was filed, failed to respond to the motion, failed to appear in court, and, after default judgment was entered, failed to inform his client that default judgment had been entered. As such, the hearing panel concludes that the respondent failed to provide competent representation to A.S. by failing to utilize the thoroughness and preparation reasonably necessary for the representation, in violation of KRPC 1.1.

"KRPC 1.3

"14. KRPC 1.3 provides: 'A lawyer shall act with reasonable diligence and promptness in representing a client.' In this case, the respondent failed to provide diligent representation to C.H.N., A.S., and M.M. With regard to C.H.N., the respondent failed to move her case along quickly. The respondent failed to respond to a motion filed in A.S.'s litigation. Finally, the respondent failed to timely file suit or send a demand letter on behalf of M.M. Accordingly, the hearing panel concludes that the respondent repeatedly violated KRPC 1.3.

"KRPC 1.4

"15. Lawyers must provide adequate communication to [their] clients. Specifically, KRPC 1.4(a) provides as follows: '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' The respondent failed to provide adequate communication to C.H.N., J.P., A.S., and M.M.

"16. The respondent failed to respond to several requests for updates from C.H.N. Regarding J.P., the respondent failed to inform J.P. that the scheduled jury trial was continued. Additionally, the respondent failed to inform J.P. that the respondent had requested an additional continuance of the jury trial. The respondent failed to notify A.S. that a hearing has been scheduled. Additionally, the respondent failed to inform A.S. that the court entered default judgment in her case. Finally, with regard to M.M., the respondent failed to provide M.M. with a copy of a motion filed in the litigation.

"17. Thus, the hearing panel concludes that the respondent repeatedly violated KRPC 1.4(a).

"KRPC 1.5

"18. 'A lawyer's fee shall be reasonable.' KRPC 1.5(a). Nonrefundable fees are *per se* unreasonable. The respondent charged J.P. a nonrefundable fee. Ad-

ditionally, the respondent included a provision in C.C.L.'s engagement contract that the fee was earned in full when the fee was paid. Such a provision is tantamount to charging a nonrefundable fee. The hearing panel concludes, as a result, that the respondent twice violated KRPC 1.5(a) by charging a nonrefundable fee.

"KRPC 1.16

"19. 'Upon termination of representation, a lawyer' shall take steps to the extent reasonably practicable to protect a client's interests.' KRPC 1.16(d). This provision requires lawyers to 'refund[] any advance payment of fee that has not been earned.' The respondent charged J.P. a fee and then refused to refund the unearned portion of the fee upon termination of the representation. Because the respondent refused to refund an unearned fee, the hearing panel concludes that the respondent violated KRPC 1.16(d).

"KRPC 8.4(d)

"20. 'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the respondent engaged in conduct that prejudiced the administration of justice when he failed to appear in court on behalf of A.S. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"21. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"22. *Duty Violated.* The respondent violated his duty to his clients to provide competent and diligent representation. The respondent also violated his duty to his clients to provide adequate communication. Further, the respondent violated his duty to his clients to charge a reasonable fee. Additionally, the respondent violated his duty to his client to properly terminate representation. Finally, the respondent violated his duty to the legal system to refrain from interfering with the administration of justice.

"23. *Mental State.* The respondent knowingly violated his duties.

"24. *Injury.* As a result of the respondent's misconduct, the respondent caused actual injury to his client and the legal system.

"Aggravating and Mitigating Factors

"25. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"26. *Prior Disciplinary Offenses.* With regard to C.H.N., J.P., and A.S., the respondent was placed on diversion for the misconduct. The respondent failed to

comply with the terms and conditions of diversion and, as a result, the disciplinary administrator revoked the respondent's diversion.

"27. *Dishonest or Selfish Motive.* The respondent engaged in selfish conduct when he charged nonrefundable fees. As such, the hearing panel concludes that that misconduct was motivated by selfishness.

"28. *A Pattern of Misconduct.* The respondent engaged in a pattern of misconduct by repeatedly violating KRPC 1.3 and KRPC 1.4. As such, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

"29. *Multiple Offenses.* The respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.16, and KRPC 8.4(d). Because the respondent violated six different rules, the hearing panel concludes that the respondent committed multiple offenses.

"30. *Substantial Experience in the Practice of Law.* The Kansas Supreme Court admitted the respondent to the practice of law in the State of Kansas in 1995. At the time of the misconduct, the respondent had been practicing law for more than 10 years.

"31. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"32. *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* The respondent testified that he suffers from attention deficit disorder and depression. The hearing panel concludes that the respondent's mental health issues may have contributed to the respondent's violations.

"33. *The Present and Past Attitude of the Attorney as Shown by the Attorney's Cooperation During the Hearing and the Attorney's Full and Free Acknowledgment of the Transgressions.* In the stipulation and during the formal hearing, the respondent fully and freely acknowledged the misconduct.

"34. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney.* The respondent presented letters which establish the respondent's previous good character and reputation in his community.

"35. *Remorse.* At the hearing on the formal complaint, the respondent expressed genuine remorse for having engaged in the misconduct.

"36. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.42 Suspension is generally appropriate when:
(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or
(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'6.22 Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a

client or a party, or interference or potential interference with a legal proceeding.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

### "Recommendation

"37.    At the hearing on the formal complaint, the deputy disciplinary administrator and the respondent recommended that the respondent's probation plan be adopted and that the respondent be allowed to continue to practice law subject to the supervision detailed by the respondent's probation plan.

"38.    A hearing panel may recommend probation only in certain circumstances.

'The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)    the respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)    the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii)    the misconduct can be corrected by probation; and

(iv)    placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

Kan. Sup. Ct. R. 211(g)(3).

"39.    After careful consideration, the hearing panel concludes that, pursuant to Kan. Sup. Ct. R. 211(g)(3), it is proper to recommend probation in this case. The respondent developed a workable, substantial, and detailed plan of probation and timely provided a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel. The Respondent put the proposed plan of probation into effect prior to the hearing on the formal complaint by complying with each of the terms and conditions of the probation plan. The misconduct can be corrected by probation. Finally, placing the respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.

"40.    The hearing panel recommends that the respondent be suspended from the practice of law for a period of two years. The hearing panel further recommends that the court suspend the imposition of the suspension and place the respondent on probation, according to the terms and conditions detailed below:

"41.    *Duration of Probation.* The respondent will remain on probation for 24 months from the date of the Supreme Court's opinion.

"42.  *Limitation of Practice.* The respondent will limit his practice to criminal, traffic, and collection cases. The respondent will not practice in any other areas of law. The respondent will change all advertisements, including his website to reflect the practice limitations within 30 days of the date of this report.

"43.  *Supervision.* Frank Gilman will supervise the respondent's practice. As the respondent's practice supervisor, Mr. Gilman will be afforded all immunities granted by Kan. Sup. Ct. R. 223.

'a.  The respondent will allow the practice supervisor access to his client files, calendar, and trust account records.

'b.  The respondent will comply with any requests made by the practice supervisor.

'c.  The respondent will meet with the practice supervisor every two weeks. During the regular meetings, the respondent and the practice supervisor will (1) discuss open cases, including cases which present any difficulties, (2) review the respondent's calendar for the upcoming two weeks for deadlines, court appearances, etc., and (3) review the respondent's trust account records.

'd.  If, after 12 months, the practice supervisor concludes that meeting every two weeks is not necessary, the practice supervisor may meet with the respondent on a monthly basis for the remaining probation period.

'e.  The practice supervisor will provide written monthly reports to the disciplinary administrator. The monthly reports will detail the respondent's compliance with each of the terms and conditions of probation.

'f.  If the practice supervisor discovers that the respondent violated the Kansas Rules of Professional Conduct or any term or condition of probation, the practice supervisor will immediately report the violation to the disciplinary administrator.'

"44.  *Law Office Organization.* The respondent will establish and utilize a diary and docketing system which includes a mechanism by which approaching court deadlines and statutes of limitations are noted. The respondent will review each of his cases at least every two weeks to determine what action needs to be taken. The respondent will update his calendar on a daily basis. The respondent will reconcile his calendar with his assistant's calendar on a daily basis. The respondent will reconcile his calendar with the Johnson County District Court's calendar on a weekly basis.

"45.  *Audits.* The practice supervisor will conduct audits of the respondent's files every six months, beginning September 1, 2013, and continuing throughout the time the respondent remains on probation. The practice supervisor will make a report of each audit. In conducting the audits, the practice supervisor will review each of the respondent's open case files. In the report of the audit, the practice supervisor will determine if deadlines were met, if the respondent maintained adequate communication, and if there were any irregularities in the cases. Addi-

tionally, the practice supervisor will note any matters which amount to a violation of the Kansas Rules of Professional Conduct or the Rules Relating to the Discipline of Attorneys. In the audit report, the practice supervisor will also provide the respondent with a list of changes to incorporate in his practice to improve the respondent's practice. The practice supervisor will provide a copy of the audit report to the respondent and the disciplinary administrator.

"46.  *Fee Agreements.* The respondent will enter into written fee agreements with all clients. The respondent will enter into written hourly fee agreements with all clients except clients with minor traffic ticket cases. For minor traffic ticket cases, the respondent will enter into a written fixed fee agreement. The respondent will provide a sample form written hourly fee agreement and a sample form written fixed fee agreement to the practice supervisor and the disciplinary administrator within 30 days of the date of this report. All unearned fees are fully refundable.

"47.  *Court Deadlines.* The respondent will meet all deadlines set by the courts or statutes. The respondent will appear in court for all hearings scheduled on cases in which he is counsel of record.

"48.  *Billing Statements.* The respondent will provide each client, other than clients with minor traffic ticket cases, with a monthly billing statement that details the services performed, the date which each service was performed, the time spent for each service, and the amount to be charged for each service. The respondent will provide a sample form of a billing statement to the practice supervisor and the disciplinary administrator within 30 days of the date of this report.

"49.  *Communication.* The respondent will return all telephone calls from current clients within two business dates of receipt, unless the respondent is in jury trial. If the respondent is in a jury trial and unable to timely return telephone calls, the respondent will ensure that all clients are made aware of the respondent's jury trial schedule with a recorded voicemail message. The respondent will return all telephone calls received while in jury trial within two days following the conclusion of the jury trial. The respondent will respond to all written correspondence from current clients within one week.

"50.  *KALAP Monitoring.* Throughout the period of probation, the respondent will continue to be monitored through KALAP. The respondent will comply with all terms and conditions contained in the monitoring agreement. The respondent will keep his KALAP monitor informed of his treatment plan and the names of the treatment providers.

"51.  *Psychological Evaluation.* The respondent will undergo a thorough psychological evaluation by a forensic psychologist within 60 days following the release of this report. The respondent will provide a copy of the psychological report to the practice supervisor, the KALAP monitor, the disciplinary administrator, and the respondent's treatment professionals. The respondent will comply with all recommendations made by the forensic psychologist in the psychological evaluation.

"52. *Treatment.* The respondent will continue to comply with the treatment plan established by his treatment professionals by participating in counseling and by taking prescribed medications. The respondent will not discontinue his participation in counseling or discontinue taking his medication unless the treatment providers determine that counseling or medication is no longer warranted. A treatment provider will provide the practice supervisor, the disciplinary administrator, and the KALAP monitor with quarterly updates. The quarterly updates will include the respondent's compliance with the treatment plan, the respondent's progress in treatment, and the respondent's prognosis. The respondent will execute releases necessary to allow his practice supervisor, the disciplinary administrator, and the respondent's KALAP monitor to discuss his treatment with the treatment providers.

"53. *Cooperation.* The respondent will attend any scheduled meetings with the disciplinary administrator. The respondent will provide information as requested by the disciplinary administrator.

"54. *Additional Violations.* The respondent will comply with the Kansas Rules of Professional Conduct and the Rules Relating to the Discipline of Attorneys. If the respondent violates the Kansas Rules of Professional Conduct, the Rules Relating to the Discipline of Attorneys, or any term or condition of probation, during the period of probation, the respondent will immediately report the violation to the disciplinary administrator.

"55. *Termination of Probation.* The respondent will remain on probation, even after 24 months' time, until the Supreme Court releases the respondent from probation.

'56. Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## Discussion

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether the attorney has violated the KRPC, and, if so, the discipline to be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2013 Kan. Ct. R. Annot. 356). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent received adequate notice of the formal complaint, to which he filed an answer; he filed no exceptions to the

hearing panel's final hearing report. With no exceptions before us, we deem the panel's findings of fact admitted. See Supreme Court Rule 212(c) and (d) (2013 Kan. Ct. R. Annot. 375).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct in violation of KRPC 1.1 (2013 Kan. Ct. R. Annot. 446) (competence); 1.3 (2013 Kan. Ct. R. Annot. 464) (diligence); 1.4(a) (2013 Kan. Ct. R. Annot. 484) (communication); 1.5(a) (2013 Kan. Ct. R. Annot. 503) (fees); 1.16(d) (2013 Kan. Ct. R. Annot. 569) (termination of representation); and 8.4(d) (2013 Kan. Ct. R. Annot. 655) (engaging in conduct prejudicial to administration of justice). Further, this evidence supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. The hearing panel recommended respondent be suspended from the practice of law for 2 years, that the imposition of the suspension be suspended, and that respondent be placed on probation with the terms and conditions detailed above. The panel's recommendation is advisory only and does not prevent us from imposing a different sanction. See Supreme Court Rule 212(f). At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator urged us to adopt the probation plan recommended by the panel.

We have considered respondent's violations, the aggravating and mitigating circumstances, the relevant ABA Standards, and respondent's detailed probation plan, as well as his demeanor and presentation before this tribunal. We conclude it is in the interest of the citizens of Kansas and the legal profession to suspend respondent for 2 years but to suspend that suspension as long as respondent adheres to the probation plan detailed in the final hearing report with one change. We modify the probation plan to the extent it placed respondent on probation until released by this court and instead direct respondent be placed on probation for a 2-year term.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Kevin E. Dellett be suspended

from the practice of law in the state of Kansas, in accordance with Supreme Court Rule 203(a)(2) (2013 Kan. Ct. R. Annot. 300), for 2 years effective as of the date of this opinion. The imposition of this suspension from the practice of law shall be suspended, and respondent shall be placed on probation according to the terms discussed in paragraphs 42-54 and 56 of the panel's hearing report.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.